The next case is agenda number 5-120-350, the City of Chicago v. Alexander. Counsel for the appellant. Appellee, are you ready? You may proceed. Thank you.  My name is John Klein, and I represent the defendants in this case, all 92 of them, I believe. This case presents important issues concerning the scope of Article I, Section 5 of the Illinois Constitution, which is the Freedom of Assembly provision. It's a provision that has rarely, if ever, been independently interpreted, certainly not by this court. The case arises from a peaceful demonstration in October 2011 by the Occupy Chicago demonstrators. It occurred in Congress Plaza, which is a corner of Grant Park in Chicago. And in the course of that demonstration, the police invoked the Park Code Ordinance, which closes the parks from 11 p.m. until 6 a.m. It asked the demonstrators to leave, to cross Michigan Avenue to the sidewalk on the other side, to carry on the demonstration there. And when they declined, some of them, they were arrested and charged. The circuit court and the appellate court here both applied limited lockstep analysis, which is this court's chosen method of interpreting the state constitution vis-a-vis the federal constitution. And both of those courts agreed that the state constitution, Article I, Section 5, gives greater protection to assembly than does the First Amendment to the U.S. Constitution. Where those courts and where the parties here disagree is on the scope of those additional protections. And that's really the only issue before this court, although I don't pretend that it's a simple or easily decided issue. The tools that this court uses in its limited lockstep approach to interpret state constitutional provisions, particularly to determine whether they get a broader interpretation than the cognate federal provision and how broad that protection should be, typically include, most saliently include, the language of the provision and the legislative history. And I want to turn briefly, as we do in our briefs, to the language of Article I, Section 5, and to some of the legislative history. And I should add that what we're really talking about here are two constitutions. There's the 1870 Constitution, which is where most of the language in Article I, Section 5, comes from. In the 1870 Constitution, it was Article II, Section 17. But the language was imported almost wholesale into Article I, Section 5. There was one change made. A comma was added to provide some clarity, which we can talk about. But what we're really talking about is both of those constitutions, the 1870 Constitution and the 1970 Constitution. And the most notable, immediately notable thing about Article I, Section 5 and its predecessor are that it does not track the First Amendment to the Constitution. There are provisions, of course, in the Illinois Constitution that are virtually mirrors of their federal counterpart. The search and seizure provision is an example, which this court analyzed in the Cabales case. And where that occurs, where the language of the state constitutional provision is virtually identical to its federal counterpart, this court, under the limited law approach, applies the federal precedent in construing the cognate state provision. Would you agree, Counsel, that it might be even a little more narrow than we've heard so far, and that is whether or not there's greater protections in the Illinois Constitution for expressive assembly since there are two types of assembly, right, expressive and non-expressive assembly? Well, if I may answer your question this way, Your Honor. Sure. This is an as-applied challenge, and this was certainly an expressive assembly. So in that respect, the answer is yes. Where I bridle a little bit is the division between expressive and non-expressive assemblies. I think that's not exactly what the 1970 Convention was getting at when it added the comma. What I think Father Lawler, one of the delegates, pointed out, the purpose of the comma was to make clear that all assemblies are protected, not just the ones that fall within the succeeding phrases. Now, the Article I, Section 5 talks about consulting for the common good, making known their opinions to their representatives, and applying for redress of grievances. And what the comma makes clear is that all assemblies are protected, not just assemblies that are for one of those purposes. That can be both expressive and non-expressive assemblies that are protected, that don't involve one of those purposes. Now, having said all that, this case did involve those purposes. The occupied protesters were certainly there to consult for the common good, and they were certainly there to make known their views to their representatives. And so I think this is a case, and it's why this has come down to an as-applied challenge, that is right at the core of the protection that Article I, Section 5 provides. And to take some of the language from the appellate court opinion, we are not invoking the rights of stargazers or picnickers or soccer players. We're invoking the rights of people who come together under the protection of this amendment to consult for the common good and to make known their views to their representatives. Now, Attorney. There is no argument that there was a right under the U.S. Constitution. Well, at this point, we've certainly made that argument, and I believe we were correct in making that argument. But at this point, that's not an issue before the court. We've lost on that point, and we are here to argue the state constitutional provision. And it's notable that that was your primary argument at one time until this court directed, right? It was. And I will be the first to acknowledge that the focus below, especially in the circuit court, was on the federal constitution. Judge Donnelly really brought to the fore, in some respects, the Illinois Constitution. Again, in the appellate court, I think the argument is fair to say the argument is focused on the federal constitution, but then this court in a supervisory order focused on Article I, Section 5, and that's now where we are. Can you direct us to an analysis of how to determine the co-extent of the United States constitutional language and the Illinois constitutional language? You certainly indicated quite correctly that the words are different. The drafters made different choices. And you have argued here that by making those different choices, that it was more than just grammatical. It has meaning. It has some effect. And ultimately, you argued that the words chosen by the 1870 and then generally reaffirmed in 1970 had a broader effect than the language of the United States Constitution. I'd like you to explain that to us. Where are you deriving that from? What is it about the language itself that suggests that the rights provided under the Illinois Constitution are broader than the United States Constitution? Well, in three respects, I would say the language is broader. And then, of course, the question is going to be, so what's the significance of that broader language? And I'll talk to that as well. The language is broader in that. It is in terms of an affirmative right. The people have the right as opposed to Congress shall make no law. So it's an affirmative right. It includes the phrase to consult for the common good, which is not in the First Amendment. And it includes the phrase to make known their opinions to their representatives, which, again, is not in the First Amendment. Now, exactly what the framers of the 1870 and the 1970 Constitution spoke, I mean, focus on 1870, exactly what they meant by including that additional language is there's no clear answer to that. But they meant something by it. I mean, this Court has made clear that in interpreting the state constitution, the language, like interpreting a statute, the language is the first place to look. And this language is markedly broader than the First Amendment. In what way? Are there United States Supreme Court cases that would say these concepts are not included in the United States Constitution? No, at least not that I know of. But by the same token, in other cases where, for example, the jury trial cases, where this Court has interpreted the state constitution more broadly than the federal constitution and has looked to the language to do that, the Court has not asked whether the Supreme Court, through its case law adjudication, has interpreted the cognate federal provision to include those same rights. Again, I think we have to try to put ourselves in the minds of the framers and ask what did they have in mind when they adopted this language. And they weren't, I don't believe at least, looking ahead over the centuries or the decades and imagining what the U.S. Supreme Court would do in interpreting the First Amendment. They made a choice, and it's clearly a conscious choice, not to simply parrot the First Amendment. And, of course, in other narratives, for example, the search and seizure provision, they made a different choice. They did effectively mirror the language of the cognate amendment. So what do we draw from that? Well, what we draw from that is they meant broader rights. They meant broader rights. They chose different language, and they chose additional language, and they chose to include consulting for the common good and making known their views because they intended something broader than what the First Amendment provided. Just as I think we draw from the fact that in the search and seizure context, they mirrored the language of the Fourth Amendment, that they didn't intend anything more protective than what the Fourth Amendment provided. Here I think we have to draw the opposite. But that leaves the question of, so how much broader is it? What exactly does that mean? And there I think, again, in some ways it's the unenviable task of this court to give meaning to this additional significance of the language. But we can look at the legislative history, particularly of the 1970 amendment, and what we see in the legislative history is effectively a view that the right of assembly is almost absolute as long as it is a peaceable assembly. The questions and the comments focus on imminent violence, peaceable assembly, breach of the peace. As long as those things aren't there, and I would add that in this case they were not, the right of assembly is characterized as effectively absolute. Let me cite you to one particular piece of legislative history. Actually, there are two pieces, so let me start with one. Delegate Gertz, in 1970, talking about the Article I, Section 5. He says it means that anybody, whether a school teacher or anyone else, clergyman included, I think he was talking about it when he said that, has a right to express himself to all and sundry on all occasions as long as he doesn't breach the peace. That's in Volume 3 of the record, page 1482. That's very sweeping language. It is effectively an absolute right to assemble and to make known views to representatives as long as there is no breach of the peace. The other piece of legislative history, Your Honor, that I wanted to point out, which we talk about in our reply to you, is the rejection of the Kinney Amendment. Toward the nearing the end of the convention, Delegate Kinney proposed a provision that would have replaced, I think, Article I, Section 4, which is the free speech provision, and Article I, Section 5, which is the free assembly provision that we're dealing with here today. Effectively, what Delegate Kinney wanted to do was replace those provisions with language that effectively mirrored the First Amendment. Her provision would say that, I don't have the language in front of me, but if you took the First Amendment and just transmuted it into the context of a state provision, it would have been virtually the same. And that effort to take the Illinois Constitutional protections for speech and assembly and effectively make them mirror the First Amendment was rejected. It was rejected 70 to 16. And Delegate Gertz's comment was that that change would, as he put it, let loose a potential revolution, and he called it regressive. So, again, clearly there was an intent here to do something more than what the First Amendment does in the context of assembly. And if you look at the language and if you look at that comment by Delegate Gertz that I read before, the approach seems to have been to give a very broad protection to assembly, almost an absolute protection to assembly, as long as there's no violence, as long as there's no breach of the peace or imminent violence. Now, we are not advocating that extreme a position, even though I think there is plenty of support both in the language of Article I, Section 5. The only limitation in that language is the phrase in a peaceable manner, nor are we relying entirely on that legislative history. But I do think it shows that what we're talking about here is a right that the framers of the Constitution, both Constitutions, viewed as very broad. And I think Delegate Gertz viewed it as close to absolute, except in cases of violence. What we are proposing, rather than take that absolute a view, is strict scrutiny, which is sort of the next step down from absolute protection for a right. Strict scrutiny is a standard that's been applied a great deal. The courts are very familiar with it. It's a tool that can be readily applied, and effectively it requires a compelling state interest and the least restrictive means of advancing that interest. Do I find that standard in the language of the Constitution provision? No. Do I find it in the Constitutional Convention? No. But then I don't find time, place, or manner either. In effect, and this is why I say this is a hard task for this court, the court has to take from these sort of slender pieces of evidence, the language and the comments during the Constitutional Convention, and forge the proper standard. And in our view, the proper standard is strict scrutiny. And I think that if under a strict scrutiny standard, the absolute closure of the parks for seven hours each night with no permits, no exceptions, can't survive. Whether or not it serves compelling state interests, it certainly is not the least restrictive means of advancing those interests. Mr. Kline, you mentioned that you agree then that some sort of restriction would be available. What restrictions do you think would be available? Say, can Park A be closed from 11 to 1 and Park B closed from 11 to 3? What can the Park District do with regard to some restrictions? Well, Your Honor, I think my answer would be that it's going to depend, the burden would be on the city to justify its restrictions as the least restrictive means of advancing its important goals, safety, maintenance, and cleanliness. And it would be up to, there would have to be some evidence taken on that. But something like what you proposed would certainly make sense and might work well. I mean, we cite in our briefs there are large urban parks, like San Diego, Washington, Boston, that don't close at all. So it's doable. You can accomplish these objectives without any closure. Wouldn't the cost of placing the parks around the city be enormous? Is that justified? Do you think that would be justified? I don't know that it would be, Your Honor.  But what I would say is if this Court adopts the proper standard, let's suppose it's strict scrutiny. It's got to be a compelling state interest. It has to be the least restrictive means. I think the proper approach would be to remand for fact-finding on that standard. Because maybe the city can come in and make a showing, which it certainly hasn't so far. It has submitted one vague affidavit. But if the city can come in and make a showing that it has to close the parks for, say, an hour or two hours, well, then maybe they will have shown a compelling state interest and accomplished it through the least restrictive means. But that's a matter for proof with the burden on the city. And I don't think anything in the record allows us to make that finding. I will. Mr. Rutherford. Thank you, Mr. Klein. Ms. Layton. May it please the Court. Your Honors, my name is Carrie Maloney Layton, representing the City of Chicago. Defendants were arrested for violating the Chicago Park District Ordinance that closes the city's parks during overnight hours, regardless of their purpose for being present in the parks. It is now settled that the First Amendment did not protect defendants from nighttime assembly, and the sole remaining issue before this Court is about Article I, Section 5 of the Illinois Constitution. Under this Court's limited lockstep doctrine, it was defendants' burden to show that there's a basis to create from the presumption, the framers of our Constitution, that the provisions in our Constitution that were comparable to ones in the federal Constitution would carry the same meaning. Defendants have failed to meet that burden in this case to show any intent on the part of the framers to create a right in our Constitution that was additional or different from what was already protected by the federal Constitution. There is no support in the language, the constitutional history, or this Court's cases for that interpretation of Section 5. We therefore urge this Court to reject defendants' invitation to depart from lockstep with the First Amendment or express assembly claims like the one at issue here. To begin, defendants agree that this case is governed by the seven principles of this Court's limited lockstep doctrine, and they would never ask this Court to stray from that approach. As the Court is well aware, under limited lockstep, this Court does not reach the Illinois Constitution unless the federal Constitution does not apply, does not provide relief. And what that means is that the right in the Illinois Constitution that we're looking for has to be something that is different from the right protected under the federal Constitution. It can't be something that is already in the federal Constitution. A difference, in other words, is what we're looking for. Second, if the Court is going to look at the Illinois Constitution, there are certain defaults that this Court employs about what the framers thought when they were drafting the Constitution, including that they understood when they put a right into our Constitution that was similar to one already in the federal Constitution, that this Court was going to use federal precedent as the body to interpret our cognate state provision. And second, the framers also understood that if they intended there to be some difference, they could do that, they had to make that clear. That means before this Court will depart from lockstep with the federal Constitution and the precedent defining that Constitution, there must be some evidence to support the framers' intent. That was what the defendants in this case had the burden to show. They have not presented this Court with that evidence. First, they point to the language and the difference in the language. And it is true that our Constitution contains two clauses that are not in the First Amendment. Both Constitutions protect the right of a people peaceably to assemble, in so many words. That's the First Amendment. Our Constitution is similar. And both Constitutions protect applying for a redress of grievances. Our Constitution additionally contains the words, consult for the common good, and make known opinions to representatives. But those words, although they are different, do not describe any difference in the rights. And that's the important point. The right to consult for the common good and make known opinions to representatives is protected by the First Amendment. Defendants do not dispute that. The First Amendment protects that. And that means this Court cannot write an opinion recognizing that defendants have a right under the Illinois Constitution to consult for the common good and make known opinions because that right is protected by our Constitution but not the First Amendment. That would be absurd. And again, under limited last step, we are looking to our Constitution to fill in the gap for some difference, for something that is protected here that the First Amendment or the federal Constitution does not protect. That is simply not found in the words, consulting for the common good and making known opinions. They're different words, but the right is identical. It is also in the First Amendment. Next, another avenue in which this Court could find an intent to depart from lockstep would be in the debates, something showing the framers intended some difference. If you look at the 1970 debates, there is simply nothing in what the framers were saying that suggested that they were creating a right that was additional or different from the right in the First Amendment. We cite several pieces of the legislative history, including Vice President Smith's statement in which he said, quote, the plain language of the proposal number 17, which is our old familiar article in our own State Bill of Rights, and quite parallel, as we all know, to the First Amendment to the U.S. Constitution. And he goes on to discuss how that has been good and sufficient authority for the right to organize and bargain collectively. That's in 3 Record of Proceedings 1488. Specifically, when the framers were discussing the Make Known Opinions Clause, Delegate Gertz said it referred to the right of the people to be able to sound off on everything that occurs to them. And that is also covered in constitutions everywhere, including the Bill of Rights to the U.S. Constitution. Plainly, when he was talking about that very clause defendants are now placing so much significance on, the Make Known Opinions Clause, he did not think it was unique from, compared to the First Amendment. He thought it was also covered in the First Amendment. Again, it was defendants' burden to show that the framers wanted the Illinois right to cover something different, something additional. And in their reply brief, defendants raised for the first time, and again here, in Rural Argument, they discuss the framers defeated an amendment that would have replaced Section 5 with the language of the First Amendment. The important piece about that is that it wasn't only a proposal to replace Section 5, the right to assembly, but the proposal would have scrapped Section 3 on religion and Section 4 on free speech, and replaced all of those provisions with word-for-word the First Amendment. A refusal to adopt that proposal, which also would have thrown out the religion cases that this Court had decided, is not the same as deciding that the specific part of that, the right to assemble, is different from the First Amendment. In fact, the delegate who proposed scrapping all three of those sections and replacing it with the First Amendment, when she was discussing the proposal, said, we originally had something further on assembly. We deleted it, and we are left with some language that is substantially the same as the U.S. Constitution, but just a little bit different. Plainly, that supports our point that specifically the assembly piece of it, whatever else she thought about religion or free speech, the assembly piece of it was viewed to be quite similar to the U.S. Constitution. Defendants, in their reply brief, have also come up for the first time with discussing what the 1870 framers must have thought. I just want to point out about that, that these two particular clauses that they are saying are different from the First Amendment were not put in in 1870 to our Constitution either. Those two clauses have been in this state's Constitution going back to our first Constitution in 1818. They were also carried forward in 1848. So if they were going to speculate about what the framers thought in 1870, they're talking about the wrong set of framers. But in any event, in 1970, those framers took those clauses and carried them forward into our Constitution, and everything they said about what the right to assembly meant here in Illinois indicated that they thought it was comparable, very similar, maybe just slightly different words, but not protecting any different rights that was greater than or additional to what was already in the First Amendment. The final way in which this Court has indicated that it will find support for an intent to depart from lockstep is if there's a longstanding state tradition as reflected in this Court's cases. Again, this was dependents' burden to show or demonstrate, and they have not come forward with any cases cited by this Court that would support a different, broader intent or interpretation for Section 5 in this Court's decisions. Again, these two clauses have been in our Constitution since 1818. If at any point between then and now this Court had looked at those words and thought that they should be given an additional meaning, because that's what the framers had intended that would be in this Court's decisions, there are very few decisions specifically referencing assembly. There are a couple that we cite in our brief, and in those cases in which both the federal Constitution and the state Constitution were raised as a basis for relief, this Court decided the Constitution together, meaning in lockstep, meaning that it used the federal precedent, as its presumption is, to decide both the federal and the state claim. If the Court had rejected the federal claim and then decided the Illinois Constitution carried some additional meaning, protected an additional right, it would have gone on to decide the Illinois claim separately to give effect to those additional words. Because it did not do that, it was interpreting our Constitution in lockstep with the federal Constitution. And that means that there is no basis in state tradition or this Court's cases to support any different meaning for Section 5 compared to the First Amendment. So, turning now just to the addition of the comma and what the lower courts concluded, we agree that this Court, with remarks that opposing counsel was suggesting, that they agree that this case is about expressive assembly, not about non-expressive assembly. The courts below thought when their 1970 framers added the comma, that that meant that they were creating a right to non-expressive assembly. We submit that this Court does not need to decide that in order to decide this case because we are addressing specifically an expressive assembly, which defendants have never disputed. But if this Court is wanting to decide what the meaning of that comma was, we suggest that the comma was added simply to make clear that the subject matter of peaceable assembly that was protected was not limited to one of the three clauses that followed in the former Constitution. It used to read, peaceable assembly to consult for the common good and to make known opinions, etc. If you add a comma, it just says, peaceable assembly, comma. And as it turns out, that made our Constitution read even more close, exactly like the First Amendment than it did before. The First Amendment also protects the right of the people peaceably to assemble, comma. No qualification. But even though there is no qualification in either our Constitution or the U.S. Constitution about the kind of subject matter, that does not also mean that either our Constitution or the federal Constitution would extend beyond the purposes of expressive conduct. By 1970, when the Framers added the comma, the U.S. Supreme Court had made clear that the First Amendment was limited to protected conduct, but it was conduct that had to have an inherently expressive component. And we submit that the Framers in 1970 were put on notice, by the writing of the Cohen text, among their knowledge of federal constitutional law, that the U.S. Supreme Court had interpreted the First Amendment to have that limitation to expressive conduct. When they added the comma, they never mentioned or indicated any intent. We're going to go off in a different direction here from the First Amendment. We want to make our right protect something the First Amendment does not. And we submit that if they wanted to do something as radical as protecting soccer players, picnickers, something that had not been protected in constitutional law to date, then that wouldn't have been worth the discussion. But instead, what the Framers said was they thought our assembly right was quite parallel to the First Amendment. And it was substantially the same, except in a few different words. Those were the comments. So because they did not make a big discussion about creating a right to non-expressive assembly, we submitted simply not something that they were concerned about. There is no indication that that's what they intended. But again, this Court does not need to decide the scope of non-expressive assembly right, if it exists, at the behest of litigants who agree that they were not inducting a non-expressive assembly. Just turning to what the defendants have said about strict scrutiny, this Court does not need to reach that strict scrutiny issue if it agrees with our position that there is no intent from the Framers that our Constitution would protect any additional rights beyond what the First Amendment protects. But if this Court chooses to depart from lockstep with the First Amendment, because otherwise the First Amendment, which defendants have agreed that they would lock on the First Amendment claim, so if this Court agrees with us that the Second Part should be interpreted in lockstep, then there is no basis to go on. But if the Court does depart from lockstep, we submit that it should not adopt defendants' proposal for strict scrutiny. Instead, it should conform the extent of its departure very closely to what it determines to be the intent of our Framers. Because this Court, in its lockstep jurisprudence, has said it does not just rewrite constitutional law from scratch. What it does when it departs is it's looking for some indication from the Framers. And so we suggest that the Court's view on what the difference is in the rights should inform the extent of the departure. We submit that there is nothing in those debates supporting that the Framers thought they were creating a right that would be subject to strict scrutiny. Strict scrutiny is typically reserved for the circumstances where we are most concerned about government intrusion, and this Court has interpreted that to be circumstances in the speech context where the regulation is addressed to the content of expression. In this case, the regulation was not addressed to content. It was addressed solely to conduct, and it applied across the board regardless of any expressive purpose. And so in those circumstances, this Court has employed intermediate scrutiny. And we submit that intermediate scrutiny would allow the proper balancing between the interests the government has, which defendants agree are substantial, perhaps even compelling, and the needs of speakers or people seeking to assemble for expressive purposes. It does not make sense to match a level of scrutiny as the defendants have claimed for the first time in their reply brief to a clause on a clause-by-clause basis or based on the subject matter of the assembly, whether it's an assembly to consult for the common good or make known opinions. That would be inconsistent with this Court's jurisprudence. The defendants here have even agreed that there is no support of any sort from the framers to support that strict scrutiny was intended. And we submit that that admits, essentially, that there is no basis for this Court to depart from lockstep and choose strict scrutiny. They claim that there are portions of the debate that show the framers wanted to create an absolute right except for cases of violence. We suggest that is not true. If the debates are read, at most, a question was asked of the framers. And the question was, if we add this comma, will this change the right to issue a restriction if there is a case of imminent violence? And the response was, no, that's subject to the police power. In fact, the framers said not just the right to assembly, but all the provisions in our Bill of Rights were subject to the police power. We suggest that would be inconsistent with strict scrutiny. I see my time has elapsed. Unless there are any further questions, we ask this Court to decline the defendants' request to depart from lockstep with the First Amendment and to affirm the appellate court's judgment. Thank you, Ms. Clayton. Mr. Klein. The State's fundamental argument here is that the Article I, Section 5 has to be interpreted in lockstep with the First Amendment of the U.S. Constitution. And the clearest refutation of that point is the rejection of the Kennedy Amendment. I didn't recall the language of that provision, that proposed amendment, when I stood up before. But what it said was, the General Assembly shall make no law, and I was talking about the assembly portion of it, the General Assembly shall make no law prohibiting the right of the people peaceably to assemble and to petition the State for a redress in grievances. It was almost identical to the First Amendment freedom of assembly language, and that was rejected. And it wasn't just rejected because it also included speech and religion, as does the First Amendment to the U.S. Constitution. It was rejected roundly without any – no one said, for example, let's take out the religion provision and we'll leave the assembly. It is clear by a vote of 70 to 16, in fact, that the delegates rejected the notion that Article I, Section 5, and for that matter Article I, Section 4 and Section 3, are parallel and identical and should be construed identically to the First Amendment. Talking briefly about the language. Mr. Klein, let me ask you a few questions. Yes. Kind of based on where Ms. Layton left off, she was obviously outlining why she disagrees with your positions and talked about intermediate scrutiny that invokes the time, manner, and place restrictions. Yes. And this was on a motion to dismiss procedurally, so you didn't have a full-blown evidentiary hearing. Is that right? There were affidavits. Besides that. All right, so let me ask you this. You had said earlier that the Occupy Chicago people, the 92 arrested, were at the Congress Plaza on a corner of Grant Park, correct? Yes. Was there anything in the affidavits that described the spatial area that was involved on the corner of Grant Park, the Congress Plaza? I believe there was in the sense that they described the lack of education, the layout, but not in the sort of detail. For example, there's no map or anything like that. Well, in your separate appendix, you included the motions to dismiss that begins on the record pages A123, the affidavit of Alonzo Williams, who's the Deputy Director of Park Services. And I didn't see anything in there with any specificity about the space occupied by Occupy Chicago when we were looking at time, manner, and place as an issue. There wasn't anything in there. And I think part of what troubled Judge Donnelly about that affidavit, and he was quite critical in his opinion, was that there is no specificity. For example, what we're talking about on Congress Plaza, it is primarily just a concrete area. There is some vegetation here and there, but it is a concrete area. So the notion that allowing people to demonstrate there will damage the vegetation, over-fatigue the park, in the words of Mr. Williams' affidavit, simply doesn't apply there. And I think what troubled the circuit court so much about that affidavit is that it just makes a blanket, nonspecific allegation, which even in the context of time, place, manner restrictions, just isn't sufficient. And I think the appellate court largely ignored what the circuit court found to be troubling about that affidavit. And I might add, you asked if there was an evidentiary hearing. The way this worked, the city submitted various affidavits from police officers and also from Mr. Williams. The defendants then submitted the affidavits that you've probably seen in the record from the various participants. And the circuit court gave the city the opportunity to submit further affidavits. I think the defendants were agitating for a hearing, and the city didn't want a hearing. So the city had every opportunity to make a fuller record than it did, and it rested on Mr. Williams' affidavit, which the circuit court found correctly, I would say, was insufficient. Thank you. I am probably just about out of time, but let me just make a couple of quick points. On the language of Article I, Section 5, the city says, of course, it doesn't matter. It's different, but it doesn't matter. But suppose the shoe was on the other foot, and the language was the same as it was in Cavalis. You can bet that the city would be saying, the language is the same, and so the scope of the rights is the same. And that would be a fair argument. But the point is, language matters. And when framers, whether they were in 1818 or 1870 or 1970, choose different language and broader language, it has to be given effect. Now, what that means, how that translates into a standard, that's the hard part. But it must be given effect. It can't just be ignored. What has to be given effect? Even if it defines the same rights? Even if the words are different but the rights are the same, as we heard counsel argue? The fact that the words are different suggests that the rights are broader. Now, the Supreme Court of the United States has interpreted the First Amendment over time to include the specific additional language that appears in Article I, Section 5. But I think what this court looks to, that's not how this court has analyzed different language in the federal and state constitutions. I think the question is, did the framers intend to afford broader rights? And they did. And then if you looked at the legislative history, again, the 1970 convention, what you find is something very close to, at least on the part of Delegate Girtz, who was the chairman of the Bill of Rights Committee, something very close to an absolute right to assemble subject to prohibitions on violence. And the comments, the questions go just to that point. If there is imminent violence, can the police power step in? And of course the answer is yes. That follows from the language of the provision. The last thing I wanted to say, because I didn't touch on it in my first argument, is if this court finds that time, place, and manner analysis applies here, and by the way, I acknowledge freely that there is no discussion in the convention of strict scrutiny. There's also no discussion of time, place, and manner. So either way, this court is having to perform the difficult task of figuring out what test best applies. But if the court does apply time, place, and manner, it should do so and will do so as a matter of independent state constitutional adjudication. And it should do so more rigorously than the appellate court did. This was not a narrowly tailored provision, and that goes, Your Honor, to the affidavit from Mr. Williams, and there was no ample alternative forum. The sidewalk on the other side of Michigan Avenue is not an ample alternative forum for hundreds of demonstrators as compared to a concrete open plaza where they can be seen and heard and where they can demonstrate safely. The idea that they could be moved across Michigan Avenue, a very busy street, onto a narrow sidewalk and crammed together there and demonstrate, which would, as we point out in our reply brief, probably violate a whole series of other ordinances, just doesn't make any sense at all. It is not an ample alternative. Thank you. Case number 120350 will be taken under advisement as agenda number five. Mr. Klein, Ms. Layton, we thank you for your arguments today. You are excused. Mr. Marshall, the Illinois Supreme Court, stands adjourned until tomorrow morning at 9 a.m.